Leon SANDERS, Petitioner,

v.

James A. LYNAUGH, Director, Texas Department of Corrections, Respondent.

No. EP–84–CA–335.

United States District Court, W.D. Texas, El Paso Division.

Sept. 21, 1988.

Randy Schaffer, P.C., Houston, Tex., for petitioner.

W. Barton Boling, Asst. Atty. Gen., El Paso, Tex., for respondent.

## ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS

HUDSPETH, District Judge.

This is a petition for a writ of habeas corpus by a state prisoner under 28 U.S.C. § 2254. Petitioner Leon Sanders was convicted of murder in the 171st District Court of El Paso County, Texas, on June 3, 1981. The jury assessed punishment at fifty years imprisonment in the custody of the Texas Department of Corrections. The Court of Appeals affirmed the conviction in an unpublished opinion, and the Court of Criminal Appeals denied the petition for discretionary review. The Petitioner then sought habeas corpus relief in state court, asserting every claim which he asserts in the present petition. The state district court held an evidentiary hearing, concluded that Petitioner's claims were without merit, and recommended that habeas corpus relief be denied. The Texas Court of Criminal Appeals denied the application without a written order. The Petitioner then filed the present petition for a writ of habeas corpus in this Court. The petition was referred to a United States Magistrate for review and for the preparation of a report and recommendation to the Court. The Magistrate's Report and Recommendation has been filed and the Petitioner has filed written objections to the report of the Magistrate. This case is now ripe for decision.

In the trial court, the Petitioner relied solely upon the defense of insanity. It is not disputed that on February 12, 1980, the Petitioner caused the death of the victim, Ismael Rivera, by stabbing him with a knife. The facts and circumstances surrounding the killing are, however, quite bizarre. The evidence indicates that the Petitioner and the victim lived in adjacent apartments in the same apartment complex. The victim shared his apartment with a married couple, Mr. and Mrs. Perez. On February 12, 1980, at approximately 8:00 p.m., the Petitioner knocked on the door of the victim's apartment and asked Mrs. Perez for a flashbulb. Mrs. Perez noticed at the time that the Petitioner had a knife stuck in his belt. Mrs. Perez advised the Petitioner that she did not have a camera and could not comply with his request. About 10:00 p.m. that same evening, Mr. and Mrs. Perez heard screaming, went outside, and saw the Petitioner repeatedly stabbing the victim with a knife. The victim got away from the Petitioner and ran toward his own apartment with the Petitioner in close pursuit. Mr. Perez retrieved a rifle from the apartment and forced the Petitioner to retreat. The Petitioner began screaming things at Mr. Perez, but Mr. Perez could not understand what the Petitioner was saying. When he observed that Rivera had collapsed on the floor and had suffered extremely serious stab wounds, Mr. Perez followed the Petitioner to his own apartment. The Petitioner began throwing bottles and other things at Mr. Perez, who then decided to retreat to his apartment and call the police. When police officers arrived at the scene, they went to the Petitioner's apartment and found him in a very excited and agitated state. According to Officer Salas of the El Paso Police Department, the Petitioner was perspiring heavily and his whole body was shaking. However, he was cooperative and did not struggle or resist arrest. Officer

Salas also described the Petitioner's apartment as "a shambles", with books, clothing, and garbage scattered throughout. Another police officer, Detective Amos, testified that the Petitioner's apartment was in "complete disarray". There was water standing on the bathroom floor, the commode was plugged up, the beds were completely torn apart, the sofa cushions were scattered on the floor and the kitchen was "a mess". A knife, believed to be the murder weapon, was recovered from the Petitioner's bedroom.

The victim, Ismael Rivera, died later that evening. The cause of death was massive bleeding proximately caused by the thirteen stab wounds administered by the Petitioner. The Petitioner was promptly indicted for murder. On April 11, 1980, his court-appointed counsel filed a motion for psychiatric examination of the Petitioner. The motion was granted, and the Petitioner was examined by two psychiatrists and a psychologist within the next three months. A competency trial was scheduled to determine the Petitioner's competency to stand trial for murder. On October 6, 1980, a jury found that the Petitioner was incompetent to stand trial, and that there was no substantial probability that he would regain competency to stand trial within the foreseeable future. The court then committed the Petitioner to the state hospital at Rusk, Texas, pursuant to Tex.Code Crim.Proc.Ann. art. 46.02. Within a few months, however, the medical staff at Rusk concluded that the condition of the Petitioner had improved sufficiently to permit him to stand trial. On February 11, 1981, almost exactly one year after the incident, the Petitioner was released from Rusk to the custody of the El Paso County Sheriff and was brought back to this county for trial. The trial commenced on June 1, 1981. The trial resulted in a guilty verdict and a fifty year prison sentence.

After the jury had found the Petitioner guilty of murder, and while it was deliberating with respect to the penalty phase of the trial, the Petitioner informed his counsel for the first time that a psychiatrist named Dr. William Munyon had visited him in the El Paso County Jail shortly after his arrest. According to defense counsel, this was brand new information not previously disclosed to him by the Petitioner. After the jury returned its verdict assessing punishment at fifty years imprisonment, the Petitioner's attorney attempted to located Dr. Munyon. When he succeeded in doing so, Dr. Munyon verified that he had seen the Petitioner in the county jail within a few days after his arrest for murder and had formed the opinion that the Petitioner was severely psychotic at that time. The Petitioner's attorney filed a motion for new trial based upon newly discovered evidence. After an evidentiary hearing, the trial court denied the motion, ruling that the fact of Dr. Munyon's examination was known to the Petitioner all along and was not "newly discovered". This ruling was affirmed on appeal.

■ In his quest for habeas corpus relief, the Petitioner has raised several issues, some of which overlap with one another. It is not necessary to discuss all of the issues, however, because the Court finds that one of them is dispositive of the case. The record shows that in the guilt phase of the trial, the prosecuting attorney repeatedly argued to the jury that the Petitioner would be "cut loose" if the jury accepted his insanity defense and found him not guilty by reason of insanity.[1] The

1. The prosecuting attorney first told the jury:

The big battle in this particular case is over the question of sanity and that is very obvious. The question of whether or not Leon Sanders, despite having killed Ismael Rivera, intentionally and knowingly, as a result of that argument, as a result of that fight, hand-to-hand fight out there on the street, whether or not he should be cut loose because he was insane at the time (Tr. 304–5).

Defense counsel objected to the prosecutor's use of the term "cut loose" (Tr. 305). The trial court overruled the objection (Tr. 305).

The prosecutor then said:

We are going to let the man loose on an insanity defense because his room is messy and his hair is unkempt and he has a hard look on his face (Tr. 311).

The defense attorney did not object.

Soon afterward, the prosecutor argued:

first time this expression was used, defense counsel objected (Tr. 305). The trial court overruled the objection and gave no instructions to the jury (Tr. 305). Thereafter, defense counsel did not object to the repetition of the same argument, but attempted to answer it in his final argument by suggesting to the jury that his client was mentally ill and needed help of a kind that he could not receive in a penitentiary (Tr. 327).

The prosecutor's "cut loose" argument constituted a repeated and persistent attempt to suggest to the jury that the effect of a verdict of not guilty by reason of insanity would be to allow the Petitioner to walk the streets in complete freedom. As such, it was a misstatement of the law in Texas. In this state, if a Defendant is found not guilty by reason of insanity, the trial court, if it determines that evidence exists to support the finding that the Defendant is mentally ill, is required to transfer him to the appropriate civil court for civil commitment proceedings. Tex.Code Crim.Proc.Ann. art. 46.03, § 4 (Vernon 1979). The Fifth Circuit has held that an argument like the one presented here is improper. *United States v. Williams*, 523 F.2d 1203 (5th Cir.1975); *Guidroz v. Lynaugh*, 852 F.2d 832 (5th Cir.1988). Despite the impropriety of the argument, however, a federal court may grant habeas corpus relief only if the argument was so prejudicial that it rendered the Petitioner's trial fundamentally unfair and thus violated his right to due process of law. *Felde v. Blackburn*, 795 F.2d 400, 403 (5th Cir. 1986). The prosecutor's improper and prejudicial argument must, therefore, be considered in the context of the entire trial to determine whether the evidence of Sanders' sanity was so insubstantial that, but for the improper arguments, no conviction

would probably have occurred. *Guidroz v. Lynaugh, supra* at 837; *Kirkpatrick v. Blackburn*, 777 F.2d 272, 281 (5th Cir. 1985). A careful examination of the entire record indicates that such is the case here.

The defense called three expert witnesses: Dr. Ben Passmore, a psychiatrist; Dr. Jack Butler, a psychiatrist; and Dr. Randolph Whitworth, a clinical psychologist. All three experts agreed that the Petitioner suffered from severe and chronic schizophrenia. Dr. Passmore testified that the Petitioner was first diagnosed as a paranoid schizophrenic in 1965 and was committed to the Camarillo State Hospital in California. In 1969, while the Petitioner was serving in the United States Army, he was again diagnosed as schizophrenic at William Beaumont Army Medical Center in El Paso, Texas. He was given a medical discharge from the Army because of his condition and found by the Veterans Administration to be one hundred percent disabled. In 1970, the Petitioner was admitted to a state hospital in Illinois where he was treated for schizophrenia. His next known hospital admission was at R.E. Thomason General Hospital in El Paso, Texas in 1975. Dr. Passmore, the primary defense witness, had known Petitioner and followed his case since that admission in 1975. According to Dr. Passmore, the Petitioner is a chronic schizophrenic who, with proper medication, is sometimes in remission, but at other times displays severely psychotic symptoms. Dr. Passmore's first contact with the Petitioner after the date of this offense was April 28, 1980. At that time, the Petitioner exhibited all the signs of severe schizophrenia. In response to a hypothetical question, Dr. Passmore expressed the opinion that on February 12, 1980, the Petitioner was suffering from a severe form of schizophrenia rendering him

---

That's the kind of preventive medicine that we are asking you to go back and apply in that jury room today and not cut this man loose on an educated guess but find him guilty of the offense of murder (Tr. 313). Defense counsel interposed no objection to this argument.

Finally, the prosecutor made the following statement near the close of his rebuttal argument:

This man thinks he has got a free ticket to ride and a not guilty verdict in this case means not guilty. I don't care how you cut it, not guilty. He can never be tried for this crime period. If you want to give this man a license to kill, then cut him loose because he can use that disease for the rest of his life if he wants to (Tr. 333–34). Defense counsel made no objection.

incapable of conforming his conduct to the requirements of the law.

The Petitioner's other expert witnesses, Dr. Butler and Dr. Whitworth, examined him for the first time after his arrest in this case. Their opinions basically coincided with that of Dr. Passmore, in that each concluded that the Petitioner is a chronic schizophrenic; that he was suffering from that condition on February 12, 1980, and that in reasonable probability he was legally insane at that time.[2] The State called no expert witnesses to rebut the testimony of the defense experts. It simply relied upon certain lay testimony that the Petitioner had engaged in "normal" behavior on the night of the killing. For example, police officers testified that the Petitioner had changed his shirt after the stabbing of the victim, putting on a new one without bloodstains; that he had refused to admit police officers to his apartment without a search warrant; and that in the course of testing his hands for bloodstains, he was capable of responding to directions and commands quickly and easily. However, the Fifth Circuit has observed that the testimony of a lay witness that he saw no abnormal behavior has little force when compared with expert testimony of insanity. *Brock v. United States*, 387 F.2d 254, 258 n. 11 (5th Cir.1967). Furthermore, some of the lay testimony in the instant case portrayed the Petitioner's behavior on the night of the killing as highly abnormal, even bizarre. Had the trial been conducted properly, this Court would have to face the question whether the State's evidence of sanity was insufficient as a matter of law. *Guidroz v. Lynaugh, supra* at 839; *Nagell v. United States*, 392 F.2d 934 (5th Cir. 1968); *Brock v. United States, supra*. It is not necessary to rule upon that issue in this case, however, because the improper prosecution argument coupled with the weak evidence of sanity deprived the Petitioner of a fair trial. *Guidroz v. Lynaugh, supra* at 839–40.

▮ The Court is not oblivious to the fact that Petitioner's trial counsel objected to the improper "cut loose" argument only once out of the four times that it was made. The failure to object at trial can preclude federal habeas corpus relief unless a habeas corpus petitioner can show good cause for his failure to object and actual prejudice. *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). In this case, however, the Petitioner's trial counsel did object the first time the improper argument was made, and the objection was overruled by the trial court (Tr. 305). Although it might have been better practice to object each time the argument was repeated, there is no reason to believe that the trial court would have changed his position and sustained the objection. Instead, Petitioner's trial counsel made a tactical decision to respond to the argument when his turn came to speak (Tr. 327). The outcome of the trial demonstrates that the response was too little and too late. Under the circumstances, however, the Court finds that Petitioner has shown good cause for not repeating an objection when the futility thereof became obvious. Finally, the Fifth Circuit found reversible error in *United States v. Williams, supra*, even though the trial court had sustained a defense objection and instructed the jury to disregard the improper prosecution argument.

The Petitioner's trial so lacked fundamental fairness that he was deprived of his constitutional right to due process of law. This holding does not preclude a retrial of the Petitioner's case conducted in a manner consistent with due process. *Guidroz v. Lynaugh, supra* at 840.

It is therefore ORDERED that the petition for a writ of habeas corpus in the above styled and numbered cause be, and it is hereby, GRANTED.

It is further ORDERED that the Petitioner's conviction be, and it is hereby, VACATED and SET ASIDE.

It is further ORDERED that this cause be, and it is hereby, REMANDED to the 171st District Court of El Paso County,

---

**2.** If this case is retried, a fourth expert witness, Dr. William Munyon, can be expected to give testimony that in his opinion Petitioner was legally insane on the night of the killing.

Texas, with instructions that the Petitioner be afforded a new trial.