[No. 3099.]

TOBE ZOLLICOFFER *v.* THE STATE.

1. BURGLARY.—ACCOMPLICE TESTIMONY is not of itself sufficient to support a conviction. Such testimony must be supported by corroborating evidence, obtained from other sources, establishing not only the commission of the offense but the connection of the defendant with it. See the statement of the case for the evidence of a witness *held* to constihim an accomplice, and for evidence *held* insufficient to corrobotestimony.

2. SAME—CHARGE OF THE COURT.—While in some cases it may be proper enough for the court to assume, under a certain state of facts, that a witness is an accomplice, and so to instruct the jury, the better and safer practice is to submit that question to the jury, in all cases; but in doing so great care should be taken to instruct clearly and fully as to what will constitute an accomplice under Article 741 of the Code of Criminal Procedure.

3. SAME.—ACCOMPLICE, as used in Article 741, Code of Criminal Procedure, signifies any person who has participated in the commission of the crime, whether as a principal offender, an accessory, or in any other manner which makes him a *particeps criminis.* In this case the court charged upon the meaning of accomplice as follows: "For the purposes of this case it is sufficient to define an accomplice as one who participated in the commission of an offense as a principal, as before defined." *Held,* sufficient under the facts in this case.

4. SAME.—NEW TRIAL should be granted in all cases where the verdict of conviction is unsupported by competent evidence.

5. SAME—FACT CASE.—See evidence insufficient to support a conviction for burglary.

APPEAL from the District Court of Hill. Tried below before the Hon. Jo. Abbott.

The appellant was indicted April 4, 1884, by the grand jury of Hill county for the crime of burglary, charged to have been committed on the night of November 30, 1883, by forcibly entering the store house of C. A. J. Warren, otherwise called Charley Warren, without his consent and with intent to commit theft. On March 27, 1884, he was tried, and by the jury found guilty, and his punishment assessed at six years confinement in the State penitentiary. On April 4 defendant's motion for a new trial was overruled, and he gave notice of appeal.

C. A. J. Warren was the first witness for the State. He testified that, about sunrise on the morning of December 1, 1883, he went to his store in Hillsboro and found the back or south door open, with the bolt still in the locked position, but out of the catch. The door facing was bruised and torn as if the door had been pried open with some instrument. He found his goods much displaced, and, upon examination, missed several articles, including an overcoat, worth twelve dollars and a half; a pair of dark pants with a red stripe, worth ten dollars; one pair of gray pants worth, seven dollars and a half; about ten pounds of tobacco, worth five dollars; one dozen bottles of snuff, worth thirty cents per bottle; one pair of fur-tipped lady's gloves, worth one dollar; a lady's scarf, worth one dollar; two scarfs, worth

seventy-five cents each; a number of nickel sleeve and collar buttons, worth fifty cents per pair; several silk handkerchiefs, worth from seventy-five cents to a dollar each; one hat, worth two dollars and a half; and a number of pocket knives, worth seventy-five cents and a dollar each. He found his money drawer cut open, as if with a knife. The overcoat and dark pants were missed from the middle counter, about the center of the room; the light pants from a table adjoining the middle counter on the north, the hat from a box in the northeast corner, a pair of boots from a box near the front of the building, the gloves, scarfs, knives, buttons, handkerchiefs and some other articles from one of the three show cases. The cash drawer was on the east side of the house. Witness gave no one his consent to enter the said building during the night previous, or to take any of the goods described. The witness's store was situated on the south side of the public square, in the town of Hillsboro, Hill county, Texas. The burglary occurred on the night of November 30, 1883.

Within a week or two after the burglary the witness went with Captain S. C. Upshaw to a house on his place, and found several of the missing articles, among them the dark pants, the lady's scarfs, the sleeve and collar buttons, neckties and silk handkerchiefs. Witness identified the pants, scarfs, and some of the other articles, and took them away. Other articles which the witness found at this house he believed to be his, but he could not positively identify them, and for that reason did not take them. He found there other articles which he identified as his, but did not take, as they had been so soiled he had no use for them. The witness identified the scarf by his cost and selling mark, both of which were written in his own handwriting. Witness found a pocket book in the possession of one of Ann Raglan's girls, and a sleeve button in the possession of a colored woman on Captain Upshaw's place.

Willie Green, colored, was the next witness placed upon the stand by the State. He testified that on Friday night, November 30, 1883, between the hours of two and three o'clock, he was on his way home to the Kentucky House, near the Missouri Pacific railway depot, in Hillsboro, Texas. When he got into the alley between Booth & Son's law office and the residence of Doctor Bond, he was overtaken by Willis Brown, Tobe Zollicoffer (the defendant), Roe Elliott and Smith Barnes. Brown, who had an ax in his hand, hailed the witness, saying: "Willie, we going down here to get some." Witness asked: "What?"

Brown replied: "We are going around to Charley Warren's store to get some clothes, and you must come and go with us." Witness replied that he was going home, and would not go with them to get things in that way; that he had not been raised to get things that way. Brown and Barnes then told witness that he had to go; that witness needed some clothes and a hat. Witness again declined to go, when Brown and Barnes pulled out their pistols and presented them at the witness's breast and told witness that he had to go with them, and that if he told, they would shoot witness full of holes. Witness then agreed to go.

The party named, including the witness, then went to the rear of Warren's store, Brown and Barnes keeping their pistols in their hands. Brown finally put up his pistol, inserted the blade of his ax between the door and the facing and pried them apart. The defendant placed his back against the door and pushed it in. The entire party then went into the store. They went first to the cash drawer, which Barnes cut open, using both the ax and a knife. No money was found, and Barnes remarked: "Boys, there is no money here. I was in hopes we would find a hundred or two dollars here. I would like to sink him for about that much. He is getting too d—d 'biggity,' d—n him. But as we can't get money, we will take some good clothes, which is the same thing." Brown held the candle while Barnes cut the drawer open. The party crossed to the cash drawer on the other side, shook it, but did not open it. The party then began to help themselves to such articles as they wanted. Brown took a dark pair of pants, worth ten dollars; gray pants, worth seven dollars and a half; some tobacco, worth fifty cents a pound; some snuff, worth thirty cents a bottle; a lady's scarf, worth a dollar; two scarfs worth seventy-five cents each; a pair of fur-tipped gloves, worth a dollar; some neckties, worth fifty cents each; some nickel sleeve and collar buttons, worth fifty cents each, and several silk handkerchiefs, worth seventy-five cents and a dollar a pair. When the door was opened Brown and Barnes again threatened witness with their pistols and said they would kill witness if he told. The cash drawer that was broken open was on the west side of the house.

Tobe Zollicoffer, the defendant, took an overcoat worth twelve dollars and a half; some snuff, worth thirty cents a bottle; some tobacco, worth fifty cents per pound; and a pocket knife, worth one dollar. Smith Barnes took a pair of boots, worth seven and

a half dollars, some snuff and tobacco, a pair of gloves worth seventy-five cents, and two or three silk handkerchiefs worth seventy-five cents and a dollar each. Roe Elliott got a knife which Willis Brown handed him. The dark pants and overcoat were taken from the middle counter, the gray pants from a table near, the tobacco and snuff from the west side near the south end, the boots from the front end, the hat from a box in the northeast corner, and the other articles from a show case.

Cross-examined, the witness testified that he told no one about the burglary until after his arrest. He had talked with none of the parties engaged in it after the burglary and before his arrest. None of the parties had threatened the witness since the night of the burglary. The witness first intended, if detected, to employ a lawyer to get him out of the trouble, but after his arrest was told that no lawyer could benefit him. He concluded, therefore, as the best he could do for himself, to turn State's evidence. Witness was talked to about turning State's evidence several times by different parties. He was told that he had no other means of saving himself; that if he did not turn State's evidence he would get at least twelve years in the penitentiary, and that if he did he would get only a light punishment at most. All of the parties engaged in the burglary had a grudge at the witness; Brown particularly was angry with him. Witness did not know who called to him in the alley, until they overtook him. Witness left the store first after the burglary, waited outside until the others came out, and followed them off about one hundred yards, and last saw them on that night going toward Freedmantown. Witness then went home, went to bed and slept until morning. Witness had been indicted for this offense, but did not know whether or not he was yet clear.

S. C. Upshaw testified, for the State, that some two or three weeks after the burglary of Warren's store, he went with Charley Warren to a house on his, witness's, place, and found several articles of merchandise in a trunk belonging to Willis Brown. Brown was at that time in jail, charged with the theft of a hat. Warren claimed and took away some of the articles, among which was a pair of dark pants with a stripe. Before the witness took Warren to that house, he had seen some of the goods, and supposed them to belong to Eastham Bros., who had recently lost some goods. Eastham Bros. not claiming them, witness told Warren, with the result stated.

The motion for new trial presented the questions involved in the opinion of the court.

*W. L. Boothe,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE.     This conviction is based upon the testimony of one Green, a witness who, from his own statements, was, we think, unquestionably an accomplice in the burglary and theft charged against the defendant and others.   He stood indicted for the same offense, and had turned State's evidence to avoid being prosecuted.   Being an accomplice, his testimony does not warrant this conviction unless it is corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.   (Code Crim. Proc., Art. 741.)   We have searched the record in vain for any evidence corroborating the witness Green, which, even in a remote degree, tends to connect this defendant with the offense committed.   There is evidence corroborating him as to another party charged, but none whatever as to this defendant.   There is not a circumstance proven which points to this defendant's guilt.   His conviction rests upon the testimony alone of the witness Green.   This being the state of the case, the judgment of conviction must be set aside for the want of competent evidence to support it.

It is insisted by appellant that the court erred in submitting to the jury the question as to whether or not the witness Green was an accomplice; that the court should have directly charged the jury that he was an accomplice, the evidence being so conclusive of that fact.   Whilst it would not, under some facts, be improper for the court in its charge to assume, and to instruct the jury that a witness is an accomplice (*Williams* v. *The State,* 42 Texas, 392; *Barrera* v. *The State,* Id. 260), still we do not think it is error to submit the question to the jury.   It has been the practice in such cases to submit this issue to the jury, and, believing the practice to be a safe and proper one, and in harmony with the spirit of our system of procedure, we are not disposed to change it.

In submitting this issue to the jury, however, the court should be very careful to instruct clearly and fully as to what will constitute an accomplice within the meaning of Article 741 of the

Code of Criminal Procedure. The word "accomplice" as used in that Article signifies any person who has participated in the commission of the crime, whether as a principal offender, an accessory, or in any other manner which makes him a *particeps criminis*. (*Roach* v. *The State*, 4 Texas Ct. App., 46; *Smith* v. *The State*, 13 Texas Ct. App., 507.)

In the case before us the court instructed the jury upon the meaning of an accomplice as follows: "For the purposes of this case it is sufficient to define an accomplice as one who participates in the commission of an offense as a principal, as before defined." In a previous portion of the charge the court had fully explained what facts constituted a principal. We are of the opinion that, under the facts of this case, the explanation of the term accomplice given in the charge was sufficient. If the witness Green was in fact a *particeps criminis* in the offense, it was as a principal, and the charge therefore was strictly applicable to the evidence, and as full as the facts demanded.

We are of the opinion that the court erred in refusing to grant defendant a new trial. The verdict of the jury was unsupported by competent evidence, and was contrary to the charge of the court. In such cases trial judges ought not to hesitate to set aside verdicts.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered May 24, 1884.